[No. S004653. Crim. No. 24135. Mar. 1, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEWIS, JR., Defendant and Appellant.

**COUNSEL**

Margaret Littlefield, Karen Schryver, Donald Specter and John C. Morrissey for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Robert F. Katz, Gary R. Hahn, John R. Gorey, Ivy K. Kessel and Richard L. Walker, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

PANELLI, J.—Defendant was convicted of the first degree murder (Pen. Code, § 187)[1] and robbery (§ 211) of Milton Estell with findings of use of a deadly weapon (§ 12022, subd. (b)) and personal use of a firearm (§§ 12022.5, 1203.06). A special circumstance allegation under the 1978 death penalty law was found true: that the murder was committed during the commission or attempted commission of robbery. (§ 190.2, subd. (a)(17)(i).) The jury fixed the punishment at death; the appeal is automatic. (Cal. Const., art. VI, § 11; § 1239.)

GUILT PHASE FACTS

A. *Prosecution Case.*

During the first three weeks of October 1983, Milton Estell had been trying to sell his 1980 Cadillac by parking it in a Long Beach shopping center affixed with a "for sale" sign. Mr. Estell also advertised the car in a newspaper classified ad. Mr. Estell's neighbors, Michael and Allen Washington, knew that he was selling his car. On Thursday, October 27, 1983, as they were returning home about 6:30 or 7 p.m., the Washington brothers saw Mr. Estell standing on the sidewalk in front of his house, looking at the Cadillac, and talking to defendant.[2] The hood of the car was up.

---

[1] Unless otherwise noted, all statutory references hereafter are to the Penal Code.

[2] Both Washington brothers were positive of their identification of defendant; each had picked his photo from a group shown to them separately on November 2, 1983.

Jacqueline Estell, the victim's ex-wife, tried to telephone Mr. Estell several times between 8 and 10 p.m. on October 27, to make arrangements for him to have custody of their children for the weekend. She received no answer and continued trying to call him the next morning between 7 and 7:30. She called his employer that day (Friday, Oct. 28) and learned that he had not come to work. After further unsuccessful attempts to reach Mr. Estell, she left the children with a neighbor of Mr. Estell's and left for the weekend.

Officer Laduca of the Long Beach Police Department went to Mr. Estell's house about 11 p.m. on October 28 because some neighbors had expressed concern. Both the front and back doors were locked, so Officer Laduca entered through an open window. A light was on in a back bedroom, but the room was empty. The door to the next bedroom was shut. As he opened the door he smelled a strong odor, which he recognized as the odor of a dead person. There was no furniture in the room, only some children's toys. Officer Laduca opened the sliding doors to a closet and found a Black male, lying on his side, obviously dead. The Black male was later identified as Mr. Estell. His hands and legs were tied together with neckties; yellow toilet paper was stuffed in his mouth and he was gagged with a necktie. There were three stab wounds in his chest and a bullet hole in his back. Two pillows were near the body; one had a contact bullet hole in it. Two knives were lying next to the body. The stab wounds were later determined to have been the cause of death.

The victim's wallet was lying near the body; the wallet had numerous credit cards but no cash. The Cadillac was missing. There were no signs of forced entry into the house. The front door was locked from the inside with a deadbolt. The back door was locked with a standard lock, but the deadbolt was not thrown. Defendant's palm print was found in the bathroom, on the doorjamb behind the door, near the toilet paper receptacle containing yellow toilet paper. Eleven other latent prints were lifted; two prints were the victim's, and the others were never compared with those of anyone but the victim and defendant.

Jacqueline Estell accompanied police officers to the victim's house on Monday, October 31, and found a number of things missing: a television and stand, a camera, a radio, and a cassette player. A TV Guide was lying open to the date of October 27. The next day she noticed that a gold chain and a ring were also missing. The ring was later found at the coroner's office with the victim's belongings. Mrs. Estell later identified the missing gold chain as the one that defendant had worn at the preliminary hearing.

On November 1, 1983, two Long Beach police officers spotted the missing Cadillac parked on the street with no one in it. About 35 minutes later,

defendant and a woman entered the car and drove off. The officers stopped the car, arrested the occupants, and impounded the car. Defendant was searched and found to have about $400. He gave a false name at the time of his arrest and booking.

Defendant was taken to the police station and booked. After waiving his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), he was interviewed by Detective MacLyman. Defendant said that he went to look at the Cadillac on October 24 at the owner's residence. He bought it that day—October 24—for $11,000 cash, which he had carried in a brown paper bag. The owner made out the bill of sale to defendant's girlfriend because defendant did not want the car in his name. Defendant said he had won the money playing blackjack in Las Vegas. Defendant said the entire transaction took place on the front porch; he never went in the house.

Defendant was interviewed again the next day. This time he said he had won $17,000 in Las Vegas; the day before he had said he had won $11,000. This time he said he carried the money in a white paper bag; the day before the money had been in a brown paper bag. When asked about the discrepancies, he said that Detective MacLyman must have been mistaken. Defendant continued to assert that he had bought the car on October 24, even when Detective MacLyman told him that neighbors had seen the car at the victim's residence on October 27.

Detective MacLyman found a bill of sale in the Cadillac when he searched it at the impound lot. He also found a garage door opener in the car that opened the victim's garage door. The victim's signature on the bill of sale was later determined to be a forgery.

B. *Defense Case.*

Defendant's father, Robert Lewis, Sr., testified that he had registered defendant and a girl named Tuti at the Kaialoha Motel on October 24, 1983, because defendant had no identification. He had written his driver's license number and the license plate number of Milton Estell's Cadillac on the motel registration card. The manager of the motel testified that she did not remember the transaction, but she did know that she had written down the date, room number, and amount of money paid. The customer had filled out the name, address, car license number, and number of guests.

Defendant's sister, Gladys Spillman, testified that the gold chain taken from defendant looked like the one she had purchased in January 1983 and had given to defendant.

Defendant did not testify.

GUILT PHASE CONTENTIONS

A. *Miranda.*

■ Defendant contends that the trial court erred in denying his motion to suppress statements he made to Sergeant Woodward while sitting in the backseat of a police car after his arrest. Defendant asserts that the statements were the product of a custodial interrogation without *Miranda* warnings (*Miranda* v. *Arizona, supra,* 384 U.S. 436) and that subsequent statements to Detective MacLyman were the product of that illegality.[3] The trial court ruled that it was "satisfied beyond a reasonable doubt . . . that the statements of the defendant were entirely voluntary, made in an effort to extricate himself." The court expressly found that the statements were not the result of any form of interrogation, express or implied.

The record supports the trial court's ruling. Sergeant Woodward arrived at the scene of the arrest after defendant had already been placed in the police car. Sergeant Woodward was not involved in the arrest of defendant. His presence at the location of the arrest was due to his assignment as the area sergeant covering that area. As the area sergeant he was responsible for safety and for checking on the circumstances of the traffic stop. He walked over to the police car to see if he knew the suspect. He looked in the car and defendant asked, "Is that you, Big Mike?" Sergeant Woodward said yes, and they started talking. Defendant asked, "What are they going to do with my car?" Sergeant Woodward said that it was being impounded because it had been used in a crime. Defendant replied that it was his car, that he had bought it from an elderly gentleman on October 24 for $11,000 and that he (defendant) had a signed pink slip. Sergeant Woodward commented that it was a nice car and said, "Man, you must have a good job." Defendant claimed that he got the money in Las Vegas. In response to Sergeant Woodward's question whether defendant could produce the pink slip, he said that his girlfriend had it.

The record indicates that this was a casual conversation between two acquaintances. Defendant initiated the conversation and was very concerned about what would happen to his car. The fact that defendant was handcuffed and sitting in a police car is not dispositive. While the trial court acknowledged that the setting was custodial, it refused to find that there

---

[3] Defendant's statements to Sergeant Woodward were not introduced at trial. Only defendant's later statements to Detective MacLyman were introduced at trial. Those statements were preceded by *Miranda* warnings.

had been an impermissible interrogation. The situation is similar to that in *People* v. *Maxey* (1985) 172 Cal.App.3d 661, 666-667 [218 Cal.Rptr. 274], where the defendant, who was in custody, volunteered that he had been given a forged money order by two men; the officer's subsequent questions as to the description of the men were found not to constitute a custodial interrogation. Defendant's reliance on *People* v. *Turner* (1984) 37 Cal.3d 302, 316-319 [208 Cal.Rptr. 196, 690 P.2d 669] is misplaced, for the defendants there never initiated a conversation. They were tracked down, arrested, handcuffed, and asked where their guns were.

Even if we were to find that Sergeant Woodward's questions regarding defendant's job and the location of the pink slip constituted interrogation, we would still reject defendant's claim that his statements to Detective MacLyman, elicited after *Miranda* advisements, must be suppressed as products of that interrogation. In *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], the United States Supreme Court rejected the notion that a subsequent confession must necessarily be excluded because it followed an otherwise voluntary statement that was given without *Miranda* warnings: "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether is it knowingly and voluntarily made." (470 U.S. at p. 309 [84 L.Ed.2d at p. 232].)

The facts here are similar to those in *Elstad,* where an officer who had come to the defendant's home to arrest him asked the defendant if he knew why he was there and if he knew the burglary victims. The defendant replied with an incriminating statement. He later gave a full statement at the police station after having been advised of and having waived his *Miranda* rights. The high court held that the statement at the station need not be suppressed: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 314.)

*Oregon* v. *Elstad, supra,* 470 U.S. 298, requires a similar result here. Defendant's argument for a stricter California rule has been undercut by

our holding in *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], that article I, section 28, subdivision (d) of the California Constitution ("Truth-in-Evidence" provision of Proposition 8) eliminated judicially created state remedies for violation of self-incrimination rights that are not federally compelled. (See also *People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].)

## B. *CALJIC No. 2.03.*

■ Defendant contends that the court prejudicially erred in giving CALJIC No. 2.03 (4th ed. 1979 bound vol.), which directed the jury to find that defendant's false statements may indicate a consciousness of guilt on all the charged crimes, and did not require some relationship between the crimes and the false statements.[4] Defendant acknowledges that he made false statements about his name, his purchase of the car from Mr. Estell, and his denial of an entry into Mr. Estell's house. These statements were disproved by evidence that the bill of sale was a forgery and that defendant's palm print was found in the house. Defendant asserts that the instruction was overly broad in that it allowed the jury to draw unreasonable as well as reasonable inferences of guilt from his allegedly false statements.

Defendant's argument is premised on erroneous assumptions. Contrary to defendant's assertion, the jury would not have been unreasonable in drawing inferences that defendant's false statements tended to show consciousness of guilt of *both* robbery and murder. Defendant's denial of an entry into the victim's house was clearly probative on the issue of identity of the murderer and robber. The same may be said of the claim that he had purchased the car. The car was missing after the victim was killed, and it was not unreasonable to infer that the killer had taken it.

## C. *Lack of Instruction on Grand Theft.*

■ Defendant contends that the trial court prejudicially erred in failing to instruct sua sponte on the crime of grand theft as a lesser included offense of the crime of robbery. His argument fails. The court has a duty to instruct sua sponte on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but has no such duty when there is no evidence that the offense was less than that charged.

---

[4]CALJIC No. 2.03 read as follows: "If you find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt; but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

In the present case, there was no evidence that the offense, if committed by defendant, was other than robbery. The victim had been brutally murdered and some of his property was missing. He was in possession of his car when last seen alive, and it was missing when his body was discovered. Defendant's reliance on *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346 [216 Cal.Rptr. 455, 702 P.2d 613] is misplaced, for there a grand theft instruction was warranted by the evidence, in the form of defendant's own testimony, that he did not think of taking any of the victim's property until after the victim was dead. In other words, there was substantial evidence supportive of a theft instruction. Here, by contrast, there was no evidence whatsoever to support a theft instruction. There was nothing more than sheer speculation to support the scenario now advanced by defendant that the idea of taking the victim's property did not arise until after the victim was dead. Indeed, all of the evidence in the case pointed to a robbery as the motivating factor for the murder. Defendant was seen looking at the victim's car in front of the victim's house an hour before the latter's ex-wife was unable to reach him by telephone, presumably because he was dead.

### D. *Sufficiency of Evidence.*

■ Defendant contends that the evidence is insufficient to support his robbery and murder convictions and the special circumstance finding.[5] We do not agree. ■ In reviewing sufficiency of the evidence, we view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) ■ Here defendant was seen talking with the victim and looking at his car on the night he was killed, about one hour before the victim's ex-wife was unable to contact him by telephone. The victim was brutally murdered and robbed. Defendant's palm print was found in the bathroom of the victim's house near the toilet paper that was used to gag the victim. Defendant was arrested in the victim's car, offered a forged bill of sale, denied ever having been in the victim's house, and gave a false name to the officers. He was also wearing the victim's gold chain at the time of his preliminary hearing. We conclude that the evidence is sufficient to support the robbery and murder convictions and the special circumstance finding. Defendant's argument to the contrary is based on a refusal to acknowledge the strength of the evidence that was presented.

The evidence of robbery here was considerably stronger than that in *People* v. *Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843],

---

[5] Defendant also contends that the evidence is insufficient to support a finding of premeditation and deliberation, but he concedes that we need not consider the point if we find the evidence sufficient to support the robbery/murder special circumstance.

where the nude victim was shot from close range in a public bathhouse, but there was no evidence that any personal property was in the victim's possession at the time of the murder or that any personal property of the victim was ever recovered after the murder.

Defendant's reliance on *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] is also misplaced. There the defendant intended to, and did, murder his wife. He removed her clothes, purse and rings to prevent identification of her body. We held that even though there may have been a robbery in *Green,* it would not support a robbery/murder special-circumstance finding because the robbery was merely incidental to the murder. Here, by contrast, all the evidence points to robbery as the motivating factor for the murder. Defendant was with the victim looking at the latter's car when the victim was last seen alive. The victim's car and other property were missing when his body was found.

## PENALTY PHASE FACTS

### A. *Prosecution Case.*

The only additional evidence introduced by the prosecution was defendant's stipulation that he had suffered four prior robbery convictions; two in 1977 and one each in 1972 and 1982.

### B. *Defense Case.*

Defendant presented testimony by his sister, Rose Davidson. Miss Davidson testified that she has one other sister, Gladys Spillman, and an additional brother, Ellis Williams. Williams was currently in state prison and had been in jail a couple of other times. Their father had been in prison a number of times, and their mother had died in 1967. Miss Davidson also testified that she loves defendant and cares about what happens to him.

## PENALTY PHASE CONTENTIONS

### A. *No Contest Plea as Prior Felony Conviction.*

Defense counsel stipulated to the four prior felony convictions as a matter of trial tactics to avoid the introduction of prejudicial information that would accompany proof of the convictions. Counsel felt that introducing the prior convictions by stipulation would have less impact on the jury than allowing them to be given documents to feel, look at, and read in the jury room. As a result of the stipulation, he was able to prevent the jury from

learning that defendant had used a firearm or other deadly weapon in the prior cases.

■ Defendant now contends that evidence of one of the prior convictions should not have been admitted because the conviction was based on a no contest plea.[6] We recently rejected similar contentions in *People* v. *Adcox* (1988) 47 Cal.3d 207, 254 [253 Cal.Rptr. 55, 763 P.2d 906] and *People* v. *Belmontes* (1988) 45 Cal.3d 744, 809 [248 Cal.Rptr. 126, 755 P.2d 310], and we likewise reject the contention here.

### B. *CALJIC No. 8.84.1.*

The court modified CALJIC No. 8.84.1 (4th ed. 1979 bound vol.) to add factors (*l* ) and (m): "(11) The background and history of the defendant. [¶] (m) Sympathy, compassion and mercy for the defendant." This case was tried before CALJIC No. 8.84.1 was revised in response to *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813].

Defendant contends that the trial court should have modified CALJIC No. 8.84.1 to make it clear that the same acts could not be used for more than one aggravating circumstance. He also contends that the trial court should have made it clear that his background and history (factor (*l* )) were to be considered in mitigation only. Finally, defendant contends that the court erred in refusing to delete the assertedly inapplicable factors.[7]

---

[6] Defendant had moved pretrial to strike that prior conviction on the ground that it was based on a no contest plea. The trial court denied the motion without comment.

[7] CALJIC No. 8.84.1 was given as follows: "In determining which penalty is to be imposed on defendant, you shall consider all the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstance of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal conduct.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

Defendant complains that the instruction as given allowed the jury to consider his prior felony convictions under factors (b), (c), and (*l*) and his age under factors (i) and (*l* ). He also asserts that the jury may have considered his background and history as aggravating factors. ▮ As to the prior convictions, we held in *People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741], that offenses which qualify under both factors (b) and (c) may properly be considered under both. (See also *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1248 [255 Cal.Rptr. 569, 767 P.2d 1047].) More importantly, the prosecutor in this case argued that defendant's four prior convictions were to be considered only under factor (c); as to factor (b)—presence or absence of the use of force or violence—he said, "No evidence of that in this particular phase of the case."

▮ As to defendant's age, the prosecutor did not err in arguing that the jury could consider defendant's age and the fact that he did not seem to have learned anything from his four prior convictions. To the extent that defendant is arguing that age may only be considered as a mitigating factor, he is mistaken. We explained in *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052], that mere chronological age should not of itself be deemed either an aggravating or mitigating factor: "In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience of morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case."

▮ Although the prosecutor did refer to defendant's prior convictions while discussing defendant's background and history (factor (*l* )), he also made it clear that the jury was free to consider compassion, sympathy and mercy, as well as any other circumstance that mitigates the gravity of the crime. The prosecutor argued, as he was entitled to do, that there is no evidence of such mitigating factors in this case. We do not believe that the jury would have understood this argument to mean that it should count defendant's prior convictions as an aggravating factor under factor (*l* ) as well as under factor (c).

▮ Finally, it is well settled that the trial court has no duty to delete assertedly inapplicable mitigating factors. (See, e.g., *People* v. *Johnson, su-*

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which mitigates the gravity of the crime, even though it is not a legal excuse for the crime.

"(*l* ) The background and history of the defendant.

"(m) Sympathy, compassion and mercy for the defendant."

*pra,* 47 Cal.3d at p. 1247; *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) There was no impropriety in the prosecutor's reference to the absence of evidence relating to certain of the mitigating factors listed in CALJIC No. 8.84.1. It is permissible for the prosecutor to note the inapplicability of a mitigating factor so long as he does not state that the absence of such evidence constitutes an aggravating factor. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].) Here there was no such improper argument.

### C. *Sentencing Discretion.*

The court denied defendant's request to modify CALJIC No. 8.84.2 (4th ed. 1979 bound vol.) by substituting "may" for the word "shall." Defendant contends that the court's instruction using the statutory language "shall" ("If you conclude that the aggravating circumstances outweigh mitigating circumstances, you shall impose a sentence of death.") resulted in the jury's having been misled as to its role in determining the appropriateness of the death penalty. We do not agree.

In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we upheld the 1978 death penalty statute against a challenge that it withdrew constitutionally compelled sentencing discretion from the jury. We observed that "the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider." (*Id.* at p. 541.) We further stated that by directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, as a result of the weighing process, he decides that death is the appropriate penalty under all the circumstances. (*Ibid.*) We acknowledged, however, that the words "shall impose a sentence of death" left room for confusion and stated that each case must be considered on its own merits to determine whether the jury "may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Id.* at p. 544, fn. 17.)

We find no indication in the present case that the jury may have been misled about its sentencing discretion. Although the prosecutor did quote the statutory language, he did not emphasize the word "shall." He dis-

cussed the evidence as it related to the sentencing factors and emphasized that the decision as to penalty was one for the jury to determine based on the jurors' collective wisdom arising from their individual opinions. Defense counsel explained that the sentencing factors were merely guidelines about which the jurors had great leeway. They were free to decide whether something is mitigating or aggravating and how much weight to give it; one mitigating factor could be enough to spare defendant's life. Defense counsel further told the jurors that they were to decide the penalty based on their personal feelings.

Nothing in the arguments by counsel suggested to the jury that the weighing was a mere mechanical counting of factors or that the jury was without discretion to determine the appropriateness of the penalty. (See *People* v. *Burton* (1989) 48 Cal.3d 843, 869-873 [258 Cal.Rptr. 184, 771 P.2d 1270].) Accordingly, we conclude that there is no reasonable possibility that the jurors may have been misled about the scope of their sentencing discretion.

### D. *Defendant's Failure to Testify.*

▇▇▇ Defendant contends that the trial court erred in failing to instruct sua sponte that no adverse inference should be drawn from his failure to testify at the penalty phase. We recently rejected the same contention in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1208-1209 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Miranda, supra,* 44 Cal.3d at page 107; and *People* v. *Melton, supra,* 44 Cal.3d at pages 757-758, where we reaffirmed the well-established California rule that instructions against adverse inferences from a defendant's failure to testify need only be given upon his request.

### E. *Alleged Prosecutorial Misconduct.*

Defendant cites a number of instances in which the prosecutor allegedly committed misconduct, but defendant failed to raise any objection at trial. ▇▇▇ We note at the outset that under the rule of *People* v. *Green, supra,* 27 Cal.3d at pages 27-34, a defendant must object and seek a curative admonition to preserve the point for appeal. If he has not done so, we will reach the point only if the misconduct is such that the harm could not have been cured by a timely admonition. Then and only then will we reach the issue of whether, on the whole record, the harm resulted in a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. (27 Cal.3d at p. 34.)

We nevertheless consider each claim on the merits to forestall an ineffectiveness of counsel contention based on the failure to object at trial.

■ We begin by noting that the prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on other grounds in *People* v. *Green, supra,* 27 Cal.3d at pp. 33-34.) The prosecutor may not, however, argue facts or inferences not based on the evidence presented. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 212-213 [152 Cal.Rptr. 141, 589 P.2d 396].)

■ Defendant objects to the prosecutor's statements during closing argument about what was going on in the victim's mind during the last moments of his life and what his life and family must have been like.[8] Defendant asserts that such statements amounted to raising facts not in evidence. We find no impropriety in that regard. The evidence established that there were children's toys in the victim's bedroom where his body was found; it was reasonable to infer that they were there for his children's use. To the extent that the argument was inviting the jurors to put themselves in the shoes of the victim, we have found such an appeal appropriate at the penalty phase because there "the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is

---

[8]The prosecutor stated: "Chances are as far as a career was concerned he had it made along the line. He had fulfilled an ambition to whatever extent he was able to. But really what is most important to someone at that stage of their life? Why, memories of course. Milton Estell had to have had memories. His family. His neighbors. And, of course, the prospect of a secure future. Things that anyone would certainly hold dear.

"And, of course, Milton Estell was entitled to those things. One of the founding documents of our country is the Declaration of Independence, the Declaration of Independence states that every citizen, man, woman and child in this country, has certain inalienable rights. The right to life, liberty and pursuit of happiness. In this instance, the defendant, Robert Lewis, robbed Milton Estell of those three rights. And he did it with three strokes of a knife and a bullet in the back.

" . . . . . . . . . . . . . . .

"But the impact is more than just the death of Milton Estell. The impact is more than that because that death affects the people who were close to Milton Estell, the concerned neighbors, the family, and more. When the defendant plunged the knife three times into Milton Estell's chest and shot him in the back, he robbed Milton Estell of that future, of that right to a secure future. He robbed him of the chance to see his kids grow up, go to school, get married. To ever hold his grandkids if there were any. All of those things were taken away by the defendant last October.

"And more important than that, there are other victims in the form of Milton Estell's children. . . . Inferentially, Milton Estell kept toys in the empty bedroom for his kids when they came over. And you have to think about the impact of the defendant's actions upon these children. These children never again will have an opportunity to sit on their father's knee, to talk to the father, to ask those questions of a father that only a father can answer. That is part of the impact of the defendant's actions."

not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations.] In this process, one of the most significant considerations is the nature of the underlying crime. (See Pen. Code, § 190.3, [factor] (a).) Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776]; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 362, fn. 14 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 771-772 [239 Cal.Rptr. 82, 739 P.2d 1250].)

We cautioned, however, that the jury should not be given the impression that emotion may reign over reason. The court must therefore strike a careful balance between the probative and the prejudicial. It should allow evidence and argument on emotional albeit relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. But irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response, should be curtailed. (*People* v. *Haskett, supra,* 30 Cal.3d at p. 864.)

The United States Supreme Court appears to have had similar principles in mind in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. In *Booth,* the court held that the admission of victim impact statements in capital sentencing proceedings violated the principle that a sentence of death must be related to the moral culpability of the defendant. In *Gathers,* the court condemned the prosecutor's extensive references during argument to the victim's papers that had been strewn about. The prosecutor's argument went well beyond the circumstances of the crime—i.e., the fact that the papers had been strewn about—in reading to the jury the entire text of the "Game Guy's Prayer" and in referring to the fact that one of the papers was a voter's registration card. The content of these papers had no relevance to the circumstances of the crime and provided no information relevant to the defendant's moral culpability. The defendant had brutally attacked and killed the victim after the latter rebuffed the defendant's attempt to initiate a conversation while sitting on a park bench.

The prosecutor's references in this case to the victim and his family were more fleeting and restrained than those condemned in *Booth* and *Gathers.* However, even if such references constituted error under *Booth* and *Gathers,* we do not read those cases as establishing a rule that such error is reversible per se. The United States Supreme Court explained in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] that the general

rule is that errors of federal constitutional dimension are subject to a harm-less-error analysis under the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. In our view, that rule governs here. Under the *Chapman* test, the impropriety was nonprejudicial. The objectionable references were relative-ly brief in the context of the entire argument. At most they consumed two out of a total of thirteen pages of transcript of the argument. Moreover, they were insignificant in light of the emphasis put on defendant's four prior robbery convictions, the execution-style killing of the victim in his home, and the lack of any significant mitigating circumstances. We are convinced that any error under *Booth* and *Gathers* was harmless beyond a reasonable doubt.

■ Defendant next objects to the prosecutor's argument that defend-ant killed the victim to avoid detection for the crime of robbery. This was, however, a permissible inference based on the evidence presented. The fact that other inferences could also have been drawn does not invalidate the argument or render it impermissible.

■ Defendant argues that the prosecutor improperly appealed to the patriotism of the individual jurors in referring to the Declaration of Inde-pendence and arguing that Milton Estell was entitled to the right to life, liberty and the pursuit of happiness. The prosecutor was merely stating the obvious, but if there were error it clearly was harmless.

### F. *Cumulative Effect of Errors.*

■ Defendant argues that the cumulative effect of errors committed during the penalty phase requires reversal. We do not agree. To the extent that we have found any error, it certainly does not raise a reasonable possibility that the jury might have reached a more favorable result had such error or errors not occurred. (See *People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### G. *Disproportionate Penalty.*

Defendant contends that he should be given proportionality review on both an intracase and intercase basis. ■ We have held in numerous cases that intercase proportionality review is not required. (See, e.g., *People v. Howard* (1988) 44 Cal.3d 375, 444-446 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Johnson, supra,* 47 Cal.3d at p. 1253.) ■ As to intracase review, defendant relies on *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] in arguing that the death penalty is dispropor-

tionate to his culpability, pursuant to article I, section 17 of the California Constitution.

Reliance on *Dillon* will not aid defendant. In *Dillon,* an immature 17-year-old defendant, who shot and killed his victim out of fear and panic, was sentenced to life in prison despite the view of judge and jury that the sentence was excessive in relation to his true culpability. (34 Cal.3d at p. 487.) Here, by contrast, defendant entered the victim's home under the guise of buying his car, hog-tied and gagged him, and then shot and stabbed him in cold blood. We do not find the death penalty disproportionate to defendant's culpability.

### H. *Application for Modification of Verdict.*

Defendant contends the case must be remanded for a new hearing on the application for modification of verdict because the court considered matters from the probation report that had not been presented to the jury. After hearing argument from both sides the court ruled as follows: "Pursuant to Penal Code section 190.4, subsection (e), I have made an independent review of the evidence. I have taken into account and been guided by the aggravating and mitigating circumstances.

"I find that the jury's findings and verdict are according to the law and the evidence.

"I find that the aggravating circumstances outweigh the mitigating circumstances. My reasons for this are as follows: That this 32-year-old defendant has shown himself to be a hostile and violent man.

"He has been either incarcerated or on parole most of his adult life. And even before he reached adulthood he had such a severe problem in the community that Youth Authority confinement was needed. The records indicate that once before he was responsible for the death of another human being.

"The victim was not the defendant's enemy. He was no threat to him, but he was, rather a citizen attempting to sell a car. The community has not only suffered serious loss by reason of this poor man's death, but his children have likewise suffered a great loss. Perhaps the greatest loss of all.

"My perusal of the record does not reveal any significant or substantial mitigating circumstances that could possibly outweigh the aggravation involved in this case. In my view the death penalty, as recommended by the jury is appropriate.

"This is a case in which the victim was brutally killed in execution style in his own home during a robbery while the victim was unable to resist, and for these reasons the motion for new trial is denied.

"· . . . . . . . . . . . . . . . . . . .

"And so that the record is clear, I decline to modify the verdict of death heretofore decreed by the jury."

Although the court was required to read the probation report before sentencing defendant on the robbery conviction (§ 1203, subd. (b)), it should not have read and considered the probation report in ruling on the application for modification of verdict. Under section 190.4, subdivision (e), the court is directed to review the evidence presented to the jury; a probation report is not presented to the jury. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) In capital cases where the defendant has been convicted of other offenses requiring a probation report, the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict. This will ensure that the probation report does not influence the ruling on the section 190.4, subdivision (e) motion and hence will avoid the issue raised here. The same is true of victim impact statements which are permitted by section 1191.1. Such statements are not to be considered by the court in ruling on the section 190.4, subdivision (e) motion.

In *People* v. *Williams, supra,* 45 Cal.3d at pages 1329-1330, the court had read the probation report before ruling on the application for modification of verdict, but we assumed that it was not influenced by the report in ruling on the application. We further noted that even if the report had been considered, it did not work any prejudice to defendant. The same is not true in this case. Here, by contrast, the probation report contained prejudicial information about defendant's juvenile record and prior involvement in a homicide—information that would not otherwise have been known. Moreover, the record reveals that the court referred to this information in stating its reasons for denial of the application.

Accordingly, we conclude that the matter must be remanded for a new hearing on the application for modification of verdict. Preferably, the trial judge, Judge Elsworth Beam, should rehear the application on the basis of the record certified to this court. If, however, he is unavailable, the matter may be heard before another judge of the same court. (See *People* v. *Sheldon* (1989) 48 Cal.3d 935, 962-963 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204].)

INEFFECTIVENESS OF COUNSEL

Defendant contends that he received ineffective assistance from his counsel at all stages of the trial. ■ To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) "[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed." (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.) "In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*Id.* at p. 426.)

■ As the United States Supreme Court noted in *Strickland* v. *Washington*: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 343 (1983)." (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 689-690 [80 L.Ed.2d at pp. 694-695].)

A. *Pretrial Proceedings.*

Defendant charges trial counsel with incompetence during pretrial proceedings by failing (1) to move to dismiss the charges pursuant to section

995, (2) to move to suppress defendant's statements at the preliminary hearing, and (3) to use the preliminary hearing for discovery purposes. No ineffectiveness appears.

A section 995 motion would have been unavailing. Evidence at the preliminary hearing established that defendant was seen looking at the Cadillac with the victim shortly before the victim's death. Defendant was arrested while driving the victim's car. The bill of sale was forged, and defendant was wearing a gold chain like the one missing from the victim's property. An information will not be set aside if there is some rational ground for assuming the possibility that an offense has been committed and that the accused is guilty of it. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].) Counsel may not be criticized for failing to bring a motion that would have been futile.

Defendant faults counsel for not moving to suppress his statements to the police on *Miranda* grounds at the preliminary hearing. This claim fails at the outset since we have already found no merit in defendant's contention that his statements to the police were obtained in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436. Moreover, we note that counsel did make a motion for an Evidence Code section 402 hearing on this issue before his trial. The motion was denied.

Defendant also claims that counsel was ineffective for failing to use the preliminary hearing for discovery purposes. His claim, however, is supported by nothing more than bald assertions that counsel should have conducted more cross-examination. He has not met his burden of showing either incompetence or prejudice.

B. *Voir Dire.*

1. *Death Qualification.*

Defendant charges counsel with incompetence for stipulating to restrict the penalty phase voir dire to the four standard *Witherspoon* questions (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) with yes or no answers. Further questions were asked only when necessary to clarify confusing or contradictory answers.[9] Defendant claims

---

[9] The four questions were: "1. Do you have such a conscientious objection against the death penalty that if the People prove beyond a reasonable doubt that the defendant is guilty

that counsel should have spent far more time on penalty voir dire and that he could not have had any sound strategic basis for his action. We disagree.

Counsel could well have had a valid tactical reason for his action. Since the record is silent as to counsel's reasoning in this regard, we must reject the claim.[10] (See *People* v. *Pope, supra,* 23 Cal.3d at p. 426.)

### 2. *Guilt Phase.*

 Defendant charges counsel with having conducted a perfunctory voir dire and having failed to exercise peremptory challenges against a number of jurors. Defendant contends that counsel should have spent far more time on guilt phase voir dire and that such a short voir dire (less than one day) could not have been competent. Defendant also complains that trial counsel used only four peremptory challenges (one of which was exercised against an alternate). It should be noted, however, that the prosecution used only nine of its peremptory challenges.

Defendant's assumption that a short voir dire could not have been competent is not supported by the authorities he cites. None of the authorities cited by defendant purports to direct what questions should be asked during voir dire or how long the process should take. They require only that trial counsel not be unduly restricted in his voir dire of prospective jurors.

In complaining that counsel should have exercised more peremptory challenges, defendant selects isolated juror responses that do not give the full picture. Our review of the record does not support defendant's claim that counsel acted unreasonably in failing to exercise more peremptory challenges.

---

of first degree murder, you would refuse to vote for a verdict of guilty of first degree murder in order to avoid having you and your fellow jurors reach the death penalty question?

"2. Do you have such a conscientious objection against the death penalty that if the People prove beyond a reasonable doubt that the defendant is guilty of murder in the first degree and prove beyond a reasonable doubt the truthfulness of the alleged special circumstance, you would refuse to vote for a verdict that the special circumstance is true in order to avoid having you and your fellow jurors reach the death penalty question?

"3. Do you have such a conscientious objection against the death penalty that, regardless of whatever evidence might be presented during a penalty phase of the trial, should we get there, that you would automatically and absolutely refuse to consider or vote for a verdict of death in a case involving these charges and special circumstance?

"4. Do you have such conscientious opinions in favor of the death penalty that, regardless of whatever evidence might be presented during a penalty phase of the trial, should we get there, you would automatically vote for a verdict of death in a case involving these charges and special circumstance?"

[10] Defendant raised this claim in a petition for habeas corpus that we denied on September 6, 1989. Declarations filed by trial counsel revealed valid tactical reasons for his limitation of voir dire.

Though counsel's voir dire was not as lengthy as that in many cases, there is no indication that it was perfunctory or demonstrated incompetence. Counsel raised a *Wheeler* claim (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) after the prosecutor exercised two peremptory challenges against Black persons, noting that they had started with four Black persons on the jury and then were down to two. The court denied the motion. Two more jurors were selected after the *Wheeler* challenge, but the record does not reveal the race of any individual jurors.

Defendant's attack on trial counsel's jury selection tactics appears to be premised on the assumption that a more extensive voir dire would have achieved more favorable results. Nothing other than pure speculation supports such an assumption.

### C. *Closing Argument.*

Defendant contends trial counsel argued inconsistent defenses in his closing argument and thus conceded defendant's guilt. We disagree. Defendant had presented some alibi evidence in that his father had registered defendant and a girl at a motel on October 24, with the registration form showing the license plate of the victim's Cadillac. Moreover, in statements to the police, defendant claimed to have bought the car on the 24th and denied having entered the victim's house at that time. The victim's neighbors, however, saw defendant on October 27 standing in front of the victim's house with the victim, looking at the Cadillac. Defendant's palm print was found in the victim's bathroom above the yellow toilet paper that had been used to gag the victim. Other fingerprints had been found in the house that matched neither the victim's nor defendant's prints.

Trial counsel thus found himself facing evidence that was apparently contradictory. Whichever way counsel argued the evidence, he was forced to confront and address these contradictions. Accordingly, he stressed the heavy burden of proof beyond a reasonable doubt and explained the concept of circumstantial evidence, arguing that the jury was obligated to return a not guilty verdict if the evidence was susceptible to an interpretation pointing to reasonable doubt. Counsel noted the conflict about whether defendant obtained the car on the 24th or the 27th, emphasizing the motel manager's absence of motive to fabricate the October 24 date. Turning to the palm print evidence, counsel noted the presence of other fingerprints that had not been identified and suggested that perhaps someone else could have been involved with defendant in the charged crime.

Given the evidence in this case, it cannot be said that counsel's argument was outside the bounds of competent advocacy. The argument about the

other fingerprints merely conceded that defendant had been inside the house and did not necessarily undermine defendant's claim that he had bought the car on October 24. Based on defendant's statement that he had never entered the house, there was no way for counsel to explain away the prints of defendant that were found in the house. Counsel's argument would have lost any persuasive force had he not acknowledged the existence of the fingerprint evidence against defendant. Counsel merely did the best he could in the face of difficult circumstances. Defendant's argument that counsel gave away his case is premised on wishful thinking about the strength of the evidence against him. As we observed in an earlier decision, "it is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach . . . . As stated in a recent case, 'good trial tactics demanded complete candor' with the jury. [Citation.] Under the circumstances we cannot equate such candor with incompetence." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149]; see also *People* v. *Wade* (1988) 44 Cal.3d 975, 986-989 [244 Cal.Rptr. 905, 750 P.2d 794].)

## DISPOSITION

The judgment is affirmed in all respects except that the judgment of death is vacated and the cause is remanded to the trial court for the limited purpose of redetermining defendant's application for modification of the verdict in accordance with this opinion. If the trial court, upon application of the appropriate standards, denies the application for modification, it shall reinstate the judgment of death. If it grants the application, it shall enter a judgment of life without possibility of parole. Any subsequent appeal shall be limited to issues related solely to the modification application. (See *People* v. *Sheldon, supra,* 48 Cal.3d at p. 963; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 794-795.)

Lucas, C. J., Eagleson, J., Kennard, J., and Kaufman, J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death-eligibility. I agree with the majority that there was no reversible error bearing on those issues.

But I dissent from the judgment as to penalty. The prosecutor's summation at the penalty phase was improper and prejudicial under the Eighth

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

Amendment to the United States Constitution because of its extensive and emphatic comments on the personal characteristics of the victim, Milton Estell, and the effect of his death on his family.

The prosecutor's summation in its entirety fills 14 pages of the reporter's transcript. Its central text covers 10 pages. In that part, the prosecutor discussed and applied the penalty factors on which the court was about to instruct the jurors. He proceeded in reverse order from the factor of "sympathy, compassion or mercy . . . towards the defendant" to a climax in "the most important factor in your consideration in punishment in this case. That last factor is the circumstances of the crime of which the defendant was convicted and the existence of any special circumstances found to be true. [¶] This, ladies and gentlemen, is the heart of the case as far as this phase of the case goes. And I really have three points or three topics to address with regard to how this crime occurred . . . . [¶] I think we have to address, first of all, the why or the motive for killing. We have to examine . . . the nature of the offense, how the murder was accomplished. And finally, we have to consider for a moment the gravity or the impact of the defendant's actions, the impact that Robert Lewis, Jr., has had on the community, on the family, and, of course, in a personal sense upon Milton Estell."

The climax of the prosecutor's summation covers slightly more than seven pages. Two pages are devoted to the motive for the killing. Two more pages are given to the nature of the offense, and contain the following passage touching on Milton Estell's personal characteristics: "From the pictures you can draw a conclusion or an assumption as to the approximate age of Milton Estell. A man well along in life. And you have to think that at that particular time in his life about what was important to him. Chances are as far as a career was concerned, he had made it along the line. He had fulfilled an ambition to whatever extent he was able to. But really what is most important to someone at that stage of their life? Why, memories, of course. Milton Estell had to have had memories. His family. His neighbors. And, of course, the prospect of a secure future. Things that anyone would certainly hold dear." Finally, at the very climax of the climax, two more pages are devoted to Milton Estell's personal characteristics and the effect of his death on his family. They are as follows.

"Now, let's talk about for a moment the gravity of what defendant did. The impact of what he did. And this is something that here in a courtroom where things are a little more abstract, where emotion tends to run less high, it tends to get lost or swept under the carpet a little bit. I think it, again, is appropriate to discuss the impact and the gravity of Robert Lewis, Jr.'s, actions with you at this phase.

"Again, as I told you, the defendant robbed Milton Estell of the most precious gift of all, of his life. The Cadillac would have been fine. The chain just fine. And we know in the past the defendant has done it before by virtue of those convictions that the defendant had been convicted of taking the property of other people by means of force and fear on other occasions. And he was convicted of those offenses, and yet here he upped the stakes, and he robbed Milton Estell of his life.

"He took that poor man's life in a manner somewhat more aggravated than the taking of the chain, but he took it by means of force and fear and he had no right to that.

"But the impact is more than just the death of Milton Estell. The impact is more than that because that death affects the people who were close to Milton Estell, the concerned neighbors, the family, and more. When the defendant plunged the knife three times into Milton Estell's chest and shot him in the back, he robbed Milton Estell of that future, of that right to a secure future. He robbed him of the chance to see his kids grow up, go to school, get married. To ever hold his grandkids if there were any. All of those things were taken away by the defendant last October.

"And more important than that, there are other victims in the form of Milton Estell's children. In this photo that was introduced in the trial, there appears on the chest in the bedroom where the bloody spots were on the bedspread, two photos. We know from Jackie Estell that there were children from the marriage, and although the marriage had come apart, the children were there. Inferentially, Milton Estell kept toys in the empty bedroom for his kids when they came over. And you have to think about the impact of the defendant's actions upon these children. These children never again will have an opportunity to sit on their father's knee, to talk to the father, to ask those questions of a father that only a father can answer. That is part of the impact of the defendant's actions."

In *South Carolina* v. *Gathers* (1989) 490 U.S. 805, __-__ [104 L.Ed.2d 876, 883, 109 S.Ct. 2207, 2210-2211], the United States Supreme Court concluded that it was generally violative of a criminal defendant's rights under the Eighth Amendment for the prosecution to present argument at the penalty phase of a capital trial concerning such matters as the victim's personal characteristics, the emotional impact of the crime on his family, and the opinions of family members about the crime and the criminal. In so holding, the court followed *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-452, 107 S.Ct. 2529], in which it concluded that it is generally violative of those same rights to introduce evidence relating to such matters: the information is irrelevant to the decision whether the

defendant is to live or die, and its admission creates a constitutionally unacceptable risk that the decision maker may impose the ultimate sanction in an arbitrary or capricious manner.

It is plain that the prosecutor's summation in this case was constitutionally improper under *Gathers* and *Booth*. To my reading, the majority do not seriously claim otherwise. Nor could they. As shown above, the very climax of the argument was devoted to Milton Estell's personal characteristics and the effect of his death on his family. To be sure, the majority say that "The prosecutor's references in this case to the victim and his family were more fleeting and restrained than those condemned in *Booth* and *Gathers*." (Maj. opn., *ante,* at p. 284.) That may well be. But as the very words of the argument establish—and contrary to the majority's apparent implication—the prosecutor's comments were far from "fleeting" or "restrained."[1]

It is just as plain that the prosecutor's improper argument compels reversal of the judgment of death. I shall assume for purposes here that the error is not automatically reversible, but rather is subject to harmless-error analysis under the test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]: "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," or in other words, that there is no " 'reasonable possibility' " that the error " 'contributed' " to the outcome.

On this record, I am unable to conclude that the prosecutor's improper argument was harmless beyond a reasonable doubt. As the discussion above shows, the objectionable portion of the summation was relatively extensive and was also dramatically placed at the very climax. It was also moving: the words themselves prove the point. Of course, we have no *direct* evidence that the jury was in fact affected. But we do have compelling *circumstantial* evidence. In its statement of reasons for denying defendant's verdict-modification application, the court revealed unmistakably that *it* had been affected: it noted prominently—and in a virtual paraphrase of the prosecutor's words—that "The community has not only suffered serious loss by reason of this poor man's death, but his children have likewise suffered a great loss. Perhaps the greatest loss of all." Accordingly, I conclude that there is at least a reasonable possibility that the prosecutor's improper argument contributed to the outcome.

---

[1] The majority suggest at the threshold that defendant's claim is one of prosecutorial misconduct and that it was waived through defense counsel's failure to object at trial. But, "Because this case was tried before [*Booth*] and [*Gathers*], we do not describe the prosecutor's mistaken argument as misconduct. For the same reason, we could not treat a defense counsel's failure to object as . . . waiver." (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342].)

The majority, however, are of the opinion that "any error under *Booth* and *Gathers* was harmless beyond a reasonable doubt." (Maj. opn., *ante*, at p. 285.) They say: "The objectionable references were relatively brief in the context of the entire argument . . . . Moreover, they were insignificant in light of the emphasis put on defendant's four prior robbery convictions, the execution-style killing of the victim in his home, and the lack of any significant mitigating circumstances." (Maj. opn., *ante*, at p. 285.) As the discussion above shows, however, they cannot reasonably be characterized thus. Rather, they were relatively extensive, emotional, and unquestionably emphatic. There is at least a reasonable possibility that they contributed to the outcome, i.e., the difference between life and death.

For the foregoing reasons, I would reverse the judgment of death.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied May 23, 1990. Broussard, J., was of the opinion that the petition should be granted.