Filed 6/27/23  P. v. Ventura CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JUAN MANUEL DELUNA VENTURA, Defendant and Appellant. | F083976 (Super. Ct. No. MCR069756) **OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]       Before Poochigian, Acting P. J., Smith, J. and Meehan, J.

Defendant Juan Manuel Deluna Ventura was convicted by a jury of one count of first degree murder. On appeal, defendant contends that: (1) prosecutorial misconduct requires reversal of his conviction; and (2) if the issue of prosecutorial misconduct has been forfeited, he was deprived the effective assistance of counsel. We affirm.

## PROCEDURAL BACKGROUND

On May 10, 2021, the Madera County District Attorney filed an information charging defendant with the murder of Juan Sanchez (Pen. Code, § 187, subd. (a); count 1).

On January 14, 2022, a jury found defendant guilty of first degree murder.

On February 15, 2022, the trial court sentenced defendant to an indeterminate sentence of 25 years to life.

On February 16, 2022, defendant filed a notice of appeal.

## FACTUAL BACKGROUND[1]

On the afternoon of April 23, 2021, defendant ingested methamphetamine and trojan or rhino pills (what defendant referred to as "horny pills"). Defendant testified that he had been taking methamphetamine daily since November 2020, and that when he took methamphetamine, he was a different person and felt like demons were fighting inside him. After taking methamphetamine this day, he began "losing it" and was looking for a fight because someone was "messing with [him]" and his life was in danger. Defendant testified that he heard voices telling him that his daughter and a lot of other people were dead. Defendant explained that sometimes the voices made him mad, sad, or happy, but on April 23, the voices "[p]issed [him] off," manipulated him, and made him believe things that he did not know. Defendant testified that he got in his van to go from Madera

---

[1] Defendant's opening brief extensively reproduces portions of trial testimony and a transcript from defendant's in-custody police interview. We have carefully reviewed and considered the record and the quoted excerpts. For the sake of brevity, we do not include extensive verbatim recitations of the record.

2.

to Chowchilla to get into a fight because an unknown person was "messing with [him]." While he was driving, the drugs were making defendant really angry. Defendant testified that he was hearing the demons and it was like he was the demons. Defendant had heard voices as a boy, but as he grew older, the voices became more evil. Defendant was going to take his anger out on somebody, but while his was driving, he was debating with himself whether to go to Chowchilla or return home to Madera. Defendant decided to proceed to Chowchilla and had in his mind that he was going to kill somebody.

As defendant was driving in Chowchilla, he saw Sanchez riding a bicycle on the side of the road and a child riding near Sanchez. Defendant testified that he was feeling angry and in danger, like a gang was going to kill him, and that he was not thinking straight. When he saw Sanchez, defendant decided that he was going to run into the back of Sanchez's bicycle with his van. Defendant did not know Sanchez. Defendant told the police that when he saw Sanchez, he thought, "dude on the bike is gonna get it." Defendant knew that if he ran into Sanchez, then Sanchez would probably die. Defendant then sped up (because he did not want to drag Sanchez under the van and thereby prevent a fast getaway), swerved his van into the back of Sanchez, and then swerved back onto the street. Defendant did not want to hurt the child and was hoping that Sanchez would not land on the child. Defendant testified that he did not want to hurt the child because that would be bad. After seeing Sanchez hit the windshield, defendant drove away without stopping. Sanchez died on the road due to injuries from the van. A motorist saw, and security cameras recorded, defendant's van hitting Sanchez. Defendant testified several times before the jury that he had driven to Chowchilla and murdered someone.

Later that day, Chowchilla police arrested defendant and interviewed him. Police observed that defendant appeared to be under the influence of methamphetamine. Prior to conducting a recorded interview, defendant told the police that the damage on his van was because he had hit someone, and he did it on purpose. Defendant's statements in the

3.

recorded interview were generally consistent with his trial testimony: he stated that he was very angry and "losing it," he decided to go to Chowchilla to do something "cold-blooded," and he saw Sanchez and decided he would hit Sanchez, but he did not want to hurt the child. The transcript of the interview shows a number of unintelligible responses and responses that do not necessarily answer the question posed. At times, there were significant pauses between question and answer.

Psychologist Dr. Adrian Della Porta testified as a defense witness. Della Porta had assessed defendant pursuant to Evidence Code section 1017 and determined that defendant: had schizoaffective disorder bipolar type; experienced auditory hallucinations; had paranoid delusions; experienced agitation; and had poor judgment and insight about his condition because he was guarded, reluctant to speak about the hallucinations, and believed he did not need medication. Della Porta testified that his personal observations of defendant were consistent with defendant's mental health record, trial testimony, and police interview. Della Porta opined that defendant hearing voices as a child indicated an old psychosis and that methamphetamine made the voices worse and more difficult for defendant to handle. Della Porta explained that a person with a history of schizophrenia and methamphetamine use generally would have an impaired ability to comprehend, understand, and communicate, as well as possibly a distorted perception of reality.

On cross-examination, the prosecutor questioned Della Porta in part about the purpose for which he examined defendant (which was to assess defendant in possible aid of his defense), the Rosenhan study,[2] and malingering, which Della Porta had defined on direct examination as the "purposeful, making up of symptoms or exaggerating of

---

[2]     The Rosenhan study sent individuals with feigned mental health symptoms but no mental illness to mental health clinics, and the individuals were all admitted to the clinics for mental health treatment. The study concluded that if one expects something of another, then one will perceive what is expected.

4.

symptoms for secondary gain." Della Porta was asked about two tests that he could have administered to determine if defendant was malingering, as well as guidelines for malingering in the DSM-5.[3] Della Porta testified that while he had the two malingering tests with him, he did not see a need to administer the malingering tests because defendant had a lengthy mental health record that supported his diagnosis. If defendant did not have the documented history of mental illness, then Della Porta would have administered the malingering tests.

## DISCUSSION

### I. *Prosecutorial Misconduct*

#### A. *Parties' Arguments*

Defendant argues that the prosecutor engaged in misconduct during closing arguments. Defendant avers that the prosecutor argued that Della Porta's testimony regarding malingering, the Rosenhan study, and the failure to administer malingering tests undermined Della Porta's conclusions and indicated that defendant was feigning mental illness and psychotic symptoms. However, the prosecutor was fully aware that defendant's mental health records contained diagnoses of psychosis that long predated the events of this case and that those records could not be revealed to the jury. Because the prosecutor knew the contents of the excluded records negated any inference of malingering, the prosecutor's arguments were prejudicial misconduct. Also, although defense counsel did not make a prosecutorial misconduct objection, defendant argues that we should exercise our discretion to find the issue was not forfeited. If there is forfeiture, defendant argues that defense counsel was ineffective for failing to object to prosecutorial misconduct and the omission was prejudicial.

---

[3] "DSM-5" refers to the Diagnostic and Statistical Manual of Mental Disorders, fifth edition. The DSM is a comprehensive and authoritative publication that is used to diagnose and classify mental disorders. (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1194; see *Granados v. Garland* (9th Cir. 2021) 992 F.3d 755, 760, fn. 1.)

5.

The People respond that, because no objection was made, the issue of prosecutorial misconduct has been forfeited. The People also argue that there was no misconduct because the prosecutor did not ask the jury to make false inferences. There was no evidence that established beyond a reasonable doubt that defendant was hearing voices on the day of the offense. Moreover, the prosecutor expressly stated that he was not arguing that defendant did not have a mental illness or did not hear voices, rather, he was arguing that the voices did not so overcome defendant's will that he could not deliberate or premeditate the murder of Sanchez.

We agree with the People on both accounts.

### B.      *Additional Information*

Outside the presence of the jury, the trial court limited the testimony of Della Porta. The prosecutor noted that Della Porta relied on other evaluations and reports in crafting his own report and forming his own opinions. The prosecutor requested that Della Porta be prohibited from talking about the contents of the other reports. The court agreed that "Dr. Della Porta can rely on that stuff, but he cannot opine in court as to what [the other evaluations and reports say.]" Della Porta's report described one such prior report from the Permanente Medical Group as a "diagnosis of Schizoaffective Disorder-Bipolar Type, Amphetamine, Alcohol, and Cannabis Use Disorders. Records document a W&I Code 5150 from Oct. 24, 2017 to Nov. 7, 2017 with voices, paranoia, increase in agitation, arguing with the voices, threatening to kill people from the voices and becoming more aggressive with family members" (hereinafter the "October 2017 commitment").

During closing argument, the prosecutor twice agreed that defendant had mental health issues but disagreed about how to view Della Porta's testimony. The prosecutor argued in part that Della Porta could have done a better job with the issue of malingering. The prosecutor pointed out that aspects of the DSM-5 appeared to weigh in favor of malingering and that Della Porta did not take two hours to administer tests to rule out

6.

malingering. While the prosecutor admitted that Della Porta knew what he (the doctor) was doing, the prosecutor suggested that Della Porta's conclusions were more a function of the situation, which was an Evidence Code section 1017 referral, as opposed to the actual condition of the patient.

During defendant's closing, defense counsel argued that the prosecutor did not prove beyond a reasonable doubt that defendant acted willfully, deliberately, and with premeditation, which meant that defendant could only be guilty of second degree murder.[4] Defense counsel explained that defendant had taken methamphetamine before the incident and had been hearing voices since he was a child. Defense counsel argued that defendant could not deliberate or act with premeditation because of the effects of the demon voices, which had been continuously with him. Defense counsel also expressly addressed malingering and explained that Della Porta did not conduct any malingering tests because he knew that defendant had a long history of mental health issues. Della Porta was not simply assuming the existence of mental health issues. Defense counsel argued that defendant had been honest about his reality, that he was not faking it, and that he heard voices back when he was a kid.

Finally, in rebuttal, the prosecutor argued that defense counsel wanted the jury to find defendant guilty of second degree murder instead of first degree murder because the voices defendant hears are real. The prosecutor explained that he was not saying whether

---

**4**    "Murder" is the "unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) First degree murder in relevant part is defined as any kind of "willful, deliberate, and premeditated killing …." (§ 189, subd. (a).) In relation to this case, second degree murder is a killing that was not willful, deliberate, and/or premeditated. (§ 189, subd. (b).) The sentence for first degree murder is imprisonment for 25 years to life. (§ 190, subd. (a).) In relation to this case, the sentence for second degree murder would be imprisonment for 15 years to life. (*Ibid.*) Therefore, if the jury accepted defense counsel's argument that defendant did not act willfully, deliberately, or with premeditation, defendant would have been found guilty of second degree murder and would have been relieved of 10 years on the minimum term of imprisonment.

the voices were real or not. However, defense counsel wanted the jury to believe that the voices were real and somehow made defendant incapable of acting willfully and deliberately, or without premeditation, even though the evidence showed that defendant was able to do all three of those things.

### C.     Legal Standard

"[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Parker v. Matthews* (2012) 567 U.S. 37, 45; see also *People v. Dworak* (2021) 11 Cal.5th 881, 909–910 (*Dworak*).) Conduct by the prosecutor that falls short of a federal due process violation may nevertheless violate state law if it " 'involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*Dworak*, at p. 910; *People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*).)

Prosecutors are given wide latitude to vigorously argue their cases and to make fair comment on the evidence, including making reasonable inferences or deductions that may be drawn from the evidence. (*Dworak*, *supra*, 11 Cal.5th at p. 910; see also *People v. Lewis* (1990) 50 Cal.3d 262, 283 (*Lewis*) [noting that a prosecutor has the right to "fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper"].) While prosecutors may attack the defense's case and argument (*People v. Krebs* (2019) 8 Cal.5th 265, 342), and comment upon the credibility of witnesses based on facts contained in the record (*People v. Peoples* (2016) 62 Cal.4th 718, 796), the prosecutor cannot misstate facts (*People v. Powell* (2018) 6 Cal.5th 136, 183), misstate the law generally (*Bell*, *supra*, 7 Cal.5th at p. 111), or argue facts or inferences not based on the evidence presented. (*Lewis*, at p. 283.) Further, while a prosecutor cannot lead a jury to believe a fact that the prosecutor knows is untrue (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1105), a prosecutor may argue that there was no evidence to support a particular proposition after the court has properly excluded evidence on that point. (*People v. Peterson* (2020) 10 Cal.5th 409, 465.) To establish misconduct, a defendant

8.

need not demonstrate bad faith by the prosecutor. (*Bell*, at p. 111.) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

" ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 72; see also *People v. Maciel* (2013) 57 Cal.4th 482, 541.) " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.)

### D. Analysis

Defense counsel made no objections to the prosecutor's comments regarding malingering or to any aspect of the closing argument. Moreover, defendant admits that defense counsel made no objections regarding prosecutorial misconduct. Under the general rule, defendant's claim of prosecutorial misconduct has been forfeited. (*People v. Parker*, *supra*, 13 Cal.5th at pp. 71–72; *People v. Hoyt*, *supra*, 8 Cal.5th at pp. 942–943.) In addition to being forfeited, however, we conclude that the claim "is also meritless." (*People v. Maciel*, *supra*, 57 Cal.4th at p. 541.)

Defendant's claim hinges on the premise that any suggestion of malingering was improper because prior mental health records show that defendant experienced an extremely similar episode to the offense and thus, was not or could not have been malingering in April 2021 when he killed Sanchez (or presumably in July 2021 when he was evaluated by Della Porta and January 2022 when he testified at trial). Della Porta defined "malingering" to defense counsel as the purposeful making up or exaggeration of symptoms for secondary gain. The prosecutor and defense counsel used the shorthand

"faking" while describing malingering. However, the prosecutor twice told the jury that he was not disputing that defendant had mental health problems, and during rebuttal, expressly stated that he was not saying that defendant did or did not hear voices but was arguing the evidence showed that defendant remained capable of willful, deliberate, premeditated conduct even if there were voices. Thus, the prosecutor was not arguing that defendant had no mental illness or never heard voices. Rather, the prosecutor was suggesting that the voices or defendant's mental illness did not operate to such an extent that made premeditation, deliberation, and willful conduct impossible. That is, the possibility of malingering related to the extent of defendant's purported symptoms, not whether defendant had an underlying mental illness.

With this understanding, we cannot find that the prosecutor's argument was deceptive or invited the jury to accept an untrue fact. Della Porta told the jury without objection that defendant had an extensive documented history of mental illness. Of necessity, the jury also would have understood that defendant had a documented history of exhibiting symptoms of mental illness because a condition is commonly diagnosed through manifested symptoms. Della Porta's definition of malingering did not exclude the possibility of exaggerating symptoms from a diagnosed mental illness. If symptoms are "exaggerated," as opposed to "made up," it means that the symptoms are present, just not to the degree or intensity claimed. Also, it is noteworthy that Della Porta testified that malingering could be used to try to avoid a harsh penalty or get a lighter sentence. Given Della Porta's testimony, we cannot say that the prior records demonstrate that defendant could not have been malingering by exaggerating his symptoms in connection with the offense or his defense at trial. It was consistent with the evidence, and within the prosecutor's wide latitude to argue and make deductions from the evidence, to both acknowledge defendant's mental illness and suggest that defendant may have been exaggerating the symptoms of mental illness to avoid being convicted of first degree murder. (See *Lewis*, *supra*, 50 Cal.3d at p. 283.)

10.

Defendant relies heavily on the October 2017 commitment to show that the prosecutor was deceptive or argued a point he knew to be false. Admittedly, the October 2017 commitment appears very similar to the offense. Both events appear to have involved paranoia, agitation, and voices. And whereas the October 2017 commitment involved threats to kill, the April 2021 offense involved some form of intent to kill that was realized. Nevertheless, the two events are separated by about three and a half years, and defendant does not argue that he experienced similar episodes in 2018, 2019, or 2020. A single prior episode that is separated by several years would not seem to dispel the possibility that defendant was malingering in connection with the offense. Moreover, and of critical import, defendant never explains why the prior incident negates that there could be a possibility of malingering through the purposeful exaggeration of symptoms. Considering Della Porta's definition of malingering, it could be argued consistently with the October 2017 commitment that defendant had a documented history of mental illness and experiencing similar symptoms, but that he may have been exaggerating those symptoms in order to be found guilty of a less serious crime. Therefore, the October 2017 commitment is simply a prior similar episode, it is not evidence that excludes the possibility of malingering through the exaggeration of symptoms.

For this reason, the cases cited by defendant are inapposite. In each case, the prosecutor made an argument or invited an inference that the prosecutor knew to be definitively false. (*People v. Bittaker*, *supra*, 48 Cal.3d at p. 1105; *United States v. Blueford* (9th Cir. 2002) 312 F.3d 962, 968–969; *Davis v. Zant* (11th Cir. 1994) 36 F.3d 1538, 1546–1549; *United States v. Udechukwu* (1st Cir. 1993) 11 F.3d 1101, 1106.) Since the prosecutor's malingering arguments in this case are not definitively false when compared with the October 2017 commitment, these cases do not control.

In sum, the prosecutor did not engage in misconduct through arguing an untrue fact or some form of deception. It was consistent with the evidence and within the wide

range of latitude granted to prosecutors during closing arguments to suggest that defendant may have been malingering by exaggerating his symptoms and to question Della Porta's conclusions because he did not more thoroughly evaluate or consider malingering.  (See *Lewis*, *supra*, 50 Cal.3d at p. 283.)  As such, the prosecutor did not engage in misconduct under either federal or state law.[5]

## DISPOSITION

The judgment is affirmed.

---

[5]    This holding also defeats defendant's alternative ineffective assistance of counsel claim.  Without prosecutorial misconduct, there is neither deficient performance nor prejudice based on a failure to object to prosecutorial misconduct.  (Cf. *Buck v. Davis* (2017) 580 U.S. 100, 118 ["A defendant who claims to have been denied effective assistance must show both that the counsel performed deficiently and that counsel's deficient performance caused him prejudice."].)