Filed 5/22/13  P. v. Ruiz CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>FRANCISCO RUIZ,<br><br>　　　　Defendant and Appellant. | B247582<br><br>(Los Angeles County<br>Super. Ct. No. BA357126) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed as modified.

　　　　Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

The People charged defendant Francisco Ruiz with murder (count 1) and attempted murder (count 2), with enhancements alleged as to both counts that Ruiz committed the offenses for the benefit of a criminal street gang and that a principal personally and intentionally discharged a firearm causing death. (Pen. Code, §§ 187, subd. (a), 664/187, subd. (a), 186.22, subd. (b), 12022.53, subds. (d), (e)(1).)[1] The charges arose from a walk-up shooting. The prosecution theory was that Ruiz was the shooter. At a first trial, a jury could not reach a verdict on the murder count, and acquitted Ruiz of attempted murder.[2]

At a second trial, a jury convicted Ruiz of first degree murder, with findings that the murder was committed to benefit a criminal street gang and that a principal personally and intentionally discharged a firearm causing death. The prosecution theory again was that Ruiz was the shooter.

The trial court sentenced Ruiz to a total term of 50 years to life in state prison comprised of a term of 25 years to life on the murder count and 25 years for the firearm enhancement. The court ordered Ruiz to pay $7,280 in direct victim restitution through the Victims' Compensation Board, and a $200 restitution fine, and a corresponding $200 parole revocation fine (stayed). (§§ 1202.4, subds. (b), (f), 1202.45.)

Ruiz appeals. We modify the terms of the restitution fines, and affirm.

---

[1]     All further section references are to the Penal Code, unless otherwise indicated.

[2]     The record strongly supports the conclusion that the jury found there had been no attempted murder as to a second victim hit by gunfire because there was no intent to kill the second victim; the acquittal on the attempted murder count does not suggest the jury found the evidence insufficient to prove Ruiz's identity as the shooter. The split in the jury on the murder charge against Ruiz at the first trial was 10 for guilty and two for not guilty. The People also charged Ricardo Garcia with the same offenses and enhancements. Ruiz and Garcia were jointly tried at the first trial. The prosecution's theory was that Garcia aided and abetted the shooting by acting as the drop-off and getaway driver for the shooter. The jury acquitted Garcia of the attempted murder count, and acquitted him of first degree murder. The jury convicted Garcia of second degree murder, with gang and firearm enhancement findings. In short, the jury found that Garcia had, in fact, been a willing participant in the shooting. We address Garcia's appeal from his murder conviction in a separate opinion.

## FACTS[3]

### 1. The Murder

In March 2009, Jose O. (the murder victim) and his girlfriend, Perla C., lived at an apartment building on 24th Street, near San Pedro Street, with their almost one-year old daughter.[4]  On the afternoon of March 19, 2009, Perla and others, including her cousin, Juan C., were hanging out on the apartment building's front porch, talking and planning a party for Jose and Perla's daughter's upcoming birthday.  Sometime between 4:00 and 5:00 p.m., Perla noticed two men stopped in a truck down the street.  The men left after about 10 minutes.

About 5:45 p.m., Jose O. arrived home from work.  He joined the group on the front porch of the apartment building.  About 10 or 15 minutes later, a man wearing a ski mask walked up to the front of the building from the area of the intersection of 24th Street and San Pedro Street.  Speaking English, the man said, "What's up" or "What's up, homey," then pulled out a handgun and started shooting.  As Jose tried to help Perla into the apartment building with their baby, he was shot multiple times.  Perla told the masked man not to kill Jose, but the man kept shooting anyway.[5]  After the attack, the shooter walked on 24th Street toward Stanford Avenue.

The apartment building was in "territory" claimed by the Primera Flats gang.  The Primera Flats gang had graffitied on 24th Street.  Gang members were sometimes present

---

**3**    In addressing Ruiz's appeal, we summarize the facts based on the evidence at the second trial at which he was convicted.

**4**    For sake of clarity, we use first names in this opinion at certain points in order to differentiate between persons with that same or similar surnames.  No disrespect should be inferred.

**5**    The subsequent coroner's autopsy noted that Jose O.'s body was "basically riddled with bullet holes."  He suffered "eight through-and-through" gunshot wounds.  Seven of the bullet wounds were through skin and muscle; he died as the result of a bullet that hit at the lower right leg and then travelled to the back of the pelvis, continuing through the buttock, through the intestines and finally hitting the heart causing massive damage to the heart and massive internal bleeding.  A bullet hit Juan C. in the hand.

near the apartment building. Jose O. was not in a gang, and did not have any gang tattoos. Perla C. and Juan C. were not gang members.**6**

Jose O.'s brother, Jesus O., also lived in the apartment building with his family. A few minutes before the shooting, Jesus O. drove to a nearby liquor store on the corner of 24th Street and San Pedro Street to cash his check. His wife, E.P., waited outside in their car. While inside the store, Jesus heard multiple gunshots coming from the area of 24th Street. Jesus left the store, and started driving on 23rd Street toward Stanford Avenue. He turned right onto Stanford Avenue, heading toward 24th Street. As he got to 24th Street, Jesus saw a black Chevrolet Silverado pickup truck at the intersection of 24th Street and Stanford Avenue. The pickup truck was about "five or six meters" away from Jesus's car. A masked man with a gun in his hand got into the bed of the pickup truck and the truck drove on Stanford Avenue in Jesus's direction. When the pickup truck passed by Jesus's car, the two vehicles were only about "half a meter" apart; the driver of the truck almost hit Jesus's car. Jesus noticed that the driver had a shaved head, and appeared to be about 20 years old. As the truck drove on, Jesus noticed that its taillights appeared "dark" or "black"

E.P., Jesus's wife, saw a man with a gun get into the black truck. As the truck drove toward Jesus and E.P., the truck almost crashed into Jesus's car. E.P. got a "good look" at the driver when it was near Jesus's car. The driver was Latin, about 24 or 25 years old.

Maria H. lived on 24th Street between San Pedro Street and Stanford Avenue. On the afternoon of March 19, 2009, Maria heard gunshots, and looked out her window. She saw a man whose face was "covered," holding a handgun, in front of her house. The man walked down the street toward Stanford Avenue. A black pickup truck turned onto Stanford, and the man with the gun got into the pickup truck, and the truck drove away.

---

**6**     The premise floated during trial was that Jose O. was killed in a mistaken identity gang shooting.

4

E.B. also lived on 24th Street. At the time of the shooting, E.B. was in front of his house talking to a friend. He heard gunshots and turned to see a man running toward them. The man was wearing a ski mask and had a gun. E.B. jumped into the back of a nearby parked pickup truck. The man stopped "a little bit" when he got near E.B., and pointed the gun in the direction of E.B. and his friend, and asked where they were from. The masked man was about six feet away. E.B. noticed a tattoo "similar to a spider" on the man's forearm.[7] The man started running again.

## 2. The Investigation

Los Angeles Police Department (LAPD) Detective Tommy Thompson and his partner, Detective Gersna, responded to the shooting homicide scene. They arrived on scene around 8:00 p.m. By the time Detective Thompson arrived at the scene, other LAPD officers had secured the area around the apartment building and had already begun marking evidence with small placards. Detective Thompson saw Primera Flats graffiti at the intersection of 24th Street and San Pedro Street and also in front of the apartment building. Officers recovered five .40-caliber bullet casings in front of the apartment building; the casings appeared to have been fired from a semiautomatic handgun. There were "strike marks" caused by bullets in the building. A bullet that traveled through a window was recovered from inside the building; a bullet fragment was recovered from a door. Detective Thompson spoke to Perla C. and Jesus O. on the night of the shooting.

Detective Thompson learned that a store on the corner of 24th Street and San Pedro Street had a video surveillance camera outside the store. The video from the camera was played for the jury. The video showed a black Chevrolet Silverado pickup truck pulling up to the east corner of San Pedro Street just north of 24th Street at 5:46 p.m. The truck had a distinctive decal on the driver's side, and a distinctive chrome bumper. On the video, Detective Thompson saw a person walk from the area of the truck

---

[7]    At trial, Ruiz's defense counsel asked E.B. to look at a tattoo on Ruiz's arm. E.B. said it looked like "trumpet" or "scorpion."

south on San Pedro Street toward 24th Street and then walked east on 24th Street.  The truck then pulled away and turned onto 23rd Street.

On March 31, 2009, Detective Thompson saw a black Chevrolet Silverado pickup truck like the one in the liquor store video parked at a residence on 20th Street.  Detective Thompson ran the license plate and received information that it was registered to Ricardo Garcia.  On May 27, 2009, Detective Thompson saw Garcia driving the truck.  When the brakes were applied, the brake lights appeared to be tinted "smoky" as described by Jesus O.  The truck had a chrome bumper.  On May 28, 2009, police took Garcia's truck into police custody.  Detective Thompson photographed the truck.  Detective Thompson subsequently learned that Ruiz lived next door to the residence where the detective observed Garcia's truck on March 31, 2009.

On May 27, 2009, Detective Thompson received a call from detectives at LAPD's Hollywood station.  The callers told Detective Thompson that they had a man in custody who might have information about a shooting.[8]  Detective Thompson and his partner went to the station, where they interviewed Rosas.  After initial exchanges, the interview was recorded.[9]  Rosas said he had information about a shooting that came from the "guy himself."  Off-tape, Rosas said he lived outside of the territory of the 22nd Street gang, but hung out with some guys in the neighborhood.

Rosas told Detective Thompson that he (Rosas) had a conversation with Ruiz in which Ruiz said that he was involved in a shooting.  Ruiz said he walked up to a two-story apartment building wearing a ski mask and shot a man that was standing out front.  Ruiz said that "Rica" dropped him off.  On another occasion, Rosas was with Ruiz at a recycling center when Ruiz thought he recognized someone there as a person that was at the apartment building at the time of the shooting.  Ruiz was nervous because he thought that the man recognized him.

---

[8]    Luis Rosas had been arrested for possession of methamphetamine and a loaded firearm.

[9]    Parts of the interview were not audible on the tape.  During Detective Thompson's testimony at both trials, he filled in information about Rosas's statements.

On May 28, 2009, Detective Thompson showed a six-pack photographic lineup to Jesus O. and E.P. Jesus was not able to identify anyone. E.P. identified Garcia's photo.

### 3. The Criminal Case

In December 2009, the People filed an information jointly charging Garcia and Ruiz with the murder of Jose O. (count 1; § 187, subd. (a)), and the attempted murder of Juan C. (count 2; §§ 664/187, subd. (a).) As to both counts, the information alleged the crime was committed for the benefit of a criminal street gang, and that a principal personally and intentionally discharged a firearm causing death.

As noted above (see fn. 2, *ante*), the charges against Ruiz and Garcia were tried to a jury at a joint trial in early 2011. Following a mistrial in March 2011 as to the murder count against Ruiz, the murder charge against Ruiz was tried to a second jury in the summer of 2011. The testimony of the percipient witnesses established the facts of the murder summarized above.

Eyewitness E.P. identified Garcia as the driver of the getaway truck. Detective Thompson testified regarding his investigation, including E.P.'s pretrial identification of Garcia from a "six-pack" lineup of photographs, and his interview of Rosas. The evidence of the interview showed that Rosas told Detective Thompson that Ruiz had admitted he was the shooter.

When called by the prosecution at trial, Rosas denied having a conversation with Ruiz about a shooting near San Pedro Street and 24th Street.[10] Rosas testified he knew Ruiz from around their neighborhood in the area of 23rd Street, 20th Street and Griffith Avenue. Rosas testified he did not recognize a photograph of Garcia, even though he (Rosas) had previously identified Garcia in prior testimony. Rosas testified he did not remember having previously identified Garcia. Rosas testified he was arrested for possession of methamphetamine and a loaded firearm on May 27, 2009. Rosas testified

---

[10] Rosas testified at the second trial under an agreement granting him use immunity for any crimes he might admit, and immunity for perjury based on conflicts between his testimony at Ruiz's second trial and his testimony at the first joint trial against Garcia and Ruiz.

that he recalled talking to police at a police station on the day he was arrested, but he denied that he had told police that he had information about a shooting. Rosas testified that, at the time of his arrest, he did not know anything about a shooting. Rosas testified that he never spoke to Ruiz about the shooting. When shown a copy of a transcript of the recording of his interview, and a copy of a police report as to the interview, Rosas continued to testify that he did not say anything to the police. The prosecutor played several parts of the recording of Rosas's interview, each time focusing on different parts of the information given by Rosas during the interview. Each time the prosecutor played a part of Rosas's interview, Rosas denied that he said anything to the police. In essence, Rosas implicitly denied it was him speaking on the tape.

LAPD Officer Ronald Berdin testified as a gang expert. In response to a hypothetical question with facts tracking those involved in the shooting at the apartment building, Officer Berdin offered his opinion that such a crime would have been committed to benefit the 22nd Street gang. The evidence showed that Ruiz was an admitted member of the 22nd Street gang.

In his defense, Ruiz called E.B. to challenge Ruiz's identity as the shooter. In that vein, Ruiz's counsel elicited testimony from E.B. regarding a tattoo he saw on the shooter's arm on the day of the murder, and how the tattoo differed from a tattoo on Ruiz's arm at the time of trial. Ruiz's defense otherwise largely consisted of contesting the credibility of Rosas's interview with Detective Thompson, and, in particular, with the evidence showing that Rosas had stated out-of-court that he was the shooter. In short, Ruiz contended the evidence showing he was the masked shooter was not sufficient to support his conviction.

On August 1, 2011, the jury returned a verdict finding Ruiz guilty of first degree murder, with findings he committed the offense for the benefit of a criminal street gang and that a principal personally and intentionally discharged a firearm causing death.

On October 7, 2011, the trial court sentenced Ruiz to a total aggregate term of 50 years to life, and ordered him to pay $7,280 for direct victim restitution to the Victims' Compensation Board, a $200 restitution fine and a $200 parole revocation find (stayed).

Ruiz filed a timely notice of appeal.

## DISCUSSION

### 1. *Prior Conviction Evidence*

Ruiz contends his murder conviction must be reversed because his trial counsel provided ineffective assistance of counsel in failing to object to evidence showing that Ruiz had a prior firearm-related conviction.  We disagree.

### A.  The Trial Setting

As noted above, to prove the gang enhancement allegation ancillary to the murder count at the first trial as to both Garcia and Ruiz, the prosecution introduced evidence that Jose Curiel, a 22nd Street gang member, was convicted of possession of a firearm by a felon on October 27, 2006, and that Ernesto Naranjo, another member of the gang, was con-victed of assault with a semiautomatic firearm on October 26, 2007.  The jury never reached the gang enhancement ancillary to the murder count as to Ruiz at the first trial because, as also noted above, the jurors could not reach a verdict on the murder count as to Ruiz.  The jury found the gang enhancement true as to Garcia.

Before the start of the second trial against Ruiz alone, the prosecution filed a motion in limine to admit evidence -- for purposes of proving the gang enhancement allegation -- showing that Ruiz was arrested in July 2007 for criminal possession of a firearm, and ultimately convicted of a firearm-related offense.  Citing the Supreme Court's then-recent ruling in *People v. Tran* (2011) 51 Cal.4th 1040 (*Tran*), the prosecution's motion argued that Ruiz's prior conduct and conviction could be admitted to prove the "predicate offense" element of the gang enhancement statute, and that the evidence of Ruiz's prior conduct and conviction was not otherwise inadmissible under Evidence Code section 352.

Ruiz's counsel did not file a written response to this motion.  At the hearing on the motion, Ruiz's counsel stated:  ". . . I think it's clear from the *Tran* case that the prosecution can use the defendant's prior conviction for proving up the predicate [offense] aspect of the gang enhancement.  [¶]  But it also allows the . . . trial court to retain jurisdiction [*sic*] as to how much of the information of the prior conviction comes

9

in under a 352 analysis. [¶] . . . I would ask that the court -- if the court's going to allow them to use the prior conviction for establishment of the predicate [offenses] [--] I would ask that the court limit the facts that come in . . . ." Continuing on in this same vein, Ruiz's counsel argued that the court should exclude certain factual details about Ruiz's July 2007 firearm-related offense, such as the fact that the firearm Ruiz had possessed on the prior occasion was a .40-caliber firearm, the same caliber as the gun used in the murder being tried, and that the location of Ruiz's arrest was only about two blocks from the scene of Jose O.'s murder. Ruiz's counsel argued that the specific details of Ruiz's prior firearm-related offense would be "highly prejudicial," and that the court should only admit evidence showing that Ruiz had suffered a prior firearm-related conviction. Partially consistent with defense counsel's argument, the court ruled that the prosecution could not introduce evidence of the caliber of the weapon involved in Ruiz's prior arrest for the firearm offense, but could introduce facts describing the arrest, including the area where the arrest occurred and his admission to gang membership.

During trial, LAPD Officer Michael Chavez testified that he had arrested Ruiz on July 3, 2007, near the intersection of 21st Street and South Central Avenue, for being in possession of a loaded and unregistered firearm. Then, during testimony from the prosecution's gang expert, the prosecution again introduced evidence of the same two predicate offenses that were introduced at the first trial (those involving gang members Curiel and Naranjo). The prosecution's gang expert also discussed the facts of Ruiz's July 2007 arrest in discussing predicate offenses for the gang enhancement presentation. In addition, the prosecution's gang expert discussed a street conversation that he had with Ruiz in December 2008 in which Ruiz admitted his gang membership. After both sides had rested, a stipulation was read to the jury that Ruiz was convicted on July 13, 2007, for "prohibited possession of a firearm as referred to in Penal Code section 186.22, subdivision (e)" (*sic*) as a result of his arrest on July 3, 2007, that Naranjo "suffered a

conviction for violating Penal Code section 245(b)" and that Curiel suffered a conviction for "violating Penal Code section 12021, subdivision (a)."**11**

## B. Analysis

To be granted relief on a claim of ineffective assistance of counsel, a defendant must establish "(1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288; see also *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) When the record on appeal "'sheds no light'" on why a defendant's counsel acted or failed to act in the manner challenged, the judgment will be affirmed unless the defendant establishes there could be "'no satisfactory explanation'" for counsel's allegedly deficient actions or omissions. (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) A defendant establishes a reasonable probability of a more favorable determination when he persuades a reviewing court that the result of his trial was fundamentally unfair or unreliable. (*Strickland, supra*, at p. 694.)

On appeal, Ruiz argues his trial counsel misunderstood *Tran* to have held that the prosecution "can use a defendant's prior as a predicate offense *in all cases*." (Italics added.) Ruiz argues that, if his counsel had correctly read *Tran*, then he could have and should have objected to *all* evidence of Ruiz's prior firearm-related offense under Evidence Code section 352. Ruiz argues such an objection would have succeeded, and that, absent the evidence of his prior offense, the result of his second trial would have been more favorable.

---

**11**     The court's subsequent instructions to the jury included an instruction that the gang enhancement required proof of a pattern of criminal gang activity, and included this definitional instruction: "A pattern of criminal gang activity, as used here, means . . . [¶] [t]he commission of or conviction of: (1) assault with a semiautomatic firearm in violation of Penal Code section 245, (2) prohibited possession of a firearm as set forth in Penal Code section 186.22(e), and (3) murder in violation of Penal Code section 187. . . ." (Capitalization omitted.)

In *Tran*, the Supreme Court ruled that evidence of a defendant's own prior criminal conduct may be admitted to prove a predicate offense under the gang enhancement statutes (§ 186.20 et seq.), subject to an appropriate balancing of the probative value of the evidence versus its prejudicial effect under Evidence Code section 352. (*Tran, supra*, 51 Cal.4th at pp. 1046-1050.) In so ruling, the court rejected the argument that use of a defendant's prior offense to show a predicate offense is necessarily prohibited in all cases by Evidence Code section 352. (*Tran*, at p. 1046.) The Supreme Court held that Evidence Code section 352 does not automatically prohibit the use of evidence of a defendant's prior criminal conduct in all cases, nor does it automatically permit the use of the same in all cases. (*Tran*, at pp. 1048-1049.) In summary: "That evidence of a defendant's separate offense may be admissible to prove a predicate offense does not mean trial courts must in all cases admit such evidence when offered by the prosecution. Considerations such as those described in *People v. Ewoldt* [(1994)] 7 Cal.4th [380,] 404-405, will still inform the trial court's discretion and in an individual case may require exclusion of the evidence." (*Id.* at p. 1049.)

We find no *Tran*-related deficient attorney performance in Ruiz's current case. In our view, the record does not support Ruiz's assertion on appeal that his trial counsel did not understand the *Tran* case and, in particular, does not support Ruiz's assertion that his trial counsel "affirmatively conceded" that evidence of a defendant's prior conviction is admissible under *Tran* to prove predicate offenses "in all cases." On the contrary, Ruiz's trial counsel recognized that, under *Tran*, the prosecution "can use" a defendant's prior criminal conduct to prove the predicate offenses aspect of a gang enhancement allegation. That was and is a correct, albeit perhaps truncated, statement about *Tran*. *Tran* held that evidence of a defendant's prior criminal conduct to prove the predicate offenses aspect of a gang enhancement allegation is not subject to blanket exclusion in all cases, but instead, such evidence "can be used" depending upon the circumstances.

Ruiz's trial counsel argued to the trial court that it had discretion under *Tran* to decide "how much" information regarding a defendant's prior criminal conduct "comes in under a 352 analysis." That, too, was and is a correct statement of the law under *Tran*.

12

*Tran* allows for either total or partial exclusion of evidence concerning a defendant's prior criminal conduct, depending upon the circumstances presented in a particular case, subject to a balancing evaluation under Evidence Code section 352. Ruiz's argument on appeal would have us construe his trial counsel's use of the words "how much evidence comes in" to constitute a concession that "some" evidence was going to be admitted no matter what. We read the record differently. Ruiz's trial counsel argued to the trial court that it should limit the evidence that would come in, "*if the court [was] going to allow*" the prosecution to use the evidence of his prior criminal conduct to prove the predicate offenses aspect of the gang enhancement allegation. Ruiz's counsel argued for limitation of the evidence as an alternative, "if" the court allowed the prosecution to admit such evidence.

So, where does the record leave us in examining Ruiz's ineffective assistance of counsel claim? In our view, the light cast by the record illuminates a tactical decision by Ruiz's trial counsel to try making the best of the situation by arguing -- successfully in part we add -- that the evidence of Ruiz's prior criminal conduct should be sanitized. A lawyer's decisions as to making evidentiary objections at trial are generally a matter of tactics, which should not be subjected to judicial hindsight evaluation on appeal. (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) On the contrary, in evaluating a lawyer's trial tactics, we indulge a "strong presumption" that his or her conduct "falls within the wide range of reasonable professional assistance." (See *Strickland, supra*, 466 U.S. at p. 689.) Given the record before us on appeal, we cannot find that there is "no satisfactory explanation" for the actions of Ruiz's trial counsel.

In any event, assuming without deciding that there was *Tran*-related deficient attorney performance in the form of too much indulgence regarding the admissibility of evidence of Ruiz's prior criminal conduct, we would not reverse his murder conviction because we are not convinced that the result of his trial would have been different had his trial counsel argued more strenuously for the total exclusion of evidence. First, we do not agree with Ruiz that such an objection would have been successful. A review of the reporter's transcript of the Evidence Code section 402 hearing shows the trial court

13

undertook a balancing evaluation of the evidence of Ruiz's prior firearm-related arrest and viewed the evidence to be more probative than prejudicial, as the court was permitted to do under *Tran*. The court expressed its respect for jurors' ability to distinguish between the need for identity evidence to convict of the substantive murder charge and the use of evidence for other purposes. We find no reasonable probability that the court would have totally excluded the evidence of Ruiz's prior firearm-related arrest had Ruiz's counsel more strenuously argued for total exclusion.

More importantly, we do not agree that the jury's verdict necessarily resulted, as Ruiz contends, from the introduction of the evidence of his prior firearm-related arrest and conviction. The record supports a conclusion that Ruiz's conviction rested on the second jury's assessment of whether or not Ruiz had, in fact, admitted to Rosas that he (Ruiz) was the shooter. In our view, the evidence of Ruiz's prior conduct did not contribute to the jury's verdict on the substantive murder count because it did not relate to his guilt for the murder; it did not relate to his identity as the shooter. Moreover, the prior firearm-related arrest evidence was admitted so that it could be considered in the context of the gang expert's testimony on the gang enhancement allegation. It was not critical as to the jury's decision at the second trial to convict.

Apart from this, the record does not support any particular conclusions about the first trial and the second trial, except that the jury at the first trial could not unanimously agree on Ruiz's identity as the shooter, whereas the jury at the second trial could. We see nothing in the record to suggest that any particular thought processes went into one or the other of the two jury's decisions. In the end, while we agree with Ruiz that the evidence presented at his first and second trial was substantially similar, with the exception of the added evidence of his prior firearm-related arrest at his second trial,[12] we are not

---

[12]     Nine witnesses testified for the prosecution at the first trial against Garcia and Ruiz. Perla C., Jesus O., E.P., Maria H., and E.B. testified as percipient witnesses to the murder. Rosas was called about his interview with Detective Thompson, and Detective Thompson testified as an investigating officer. Eugene Carpenter of the coroner's office testified regarding cause of death. Officer Berdin testified as a police gang expert. Ruiz did not present any defense evidence at the first trial. The same prosecution witnesses

14

persuaded that the result of his second trial must be viewed to be the result of the added evidence.

## 2. *Restitution*

Ruiz contends, the People concede, and we agree that the abstract of judgment should be amended to reflect joint and several liability with Garcia for the direct victim restitution fine ($7,280) payable to the Victims' Compensation Board. The trial court orally pronounced that the restitution payment was to be joint and several with Garcia. The trial court is directed to correct the abstract of judgment accordingly.

### DISPOSITION

The judgment is affirmed as modified.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

---

testified at the second trial against Ruiz alone, except E.B., but Ruiz called E.B. as a defense witness. The most significant difference between the first and second trials was the prosecution's presentation of a 10th witness, Officer Chavez, who testified regarding Ruiz's prior crime.